## THE OLYMPIA.

(District Court, E. D. New York. April 28, 1917.)

1. EVIDENCE ⬤⟿383(8)—EFFECT OF BOOKKEEPING ENTRIES.
    A book entry charging repairs to a boat against the charterer is not conclusive, where other evidence shows that credit was in fact given to the boat, and that the bill was sent to the charterer at the request of the owner.

    [Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1669, 1670.]

2. SHIPPING ⬤⟿54—INJURY TO CHARTERED SCOWS—LIABILITY.
    A towing company used two dump scows, orally chartered from libelant, in the execution of a contract with the owner of a dumping platform to furnish scows to remove material from a subway excavation. The manner of loading was by dumping the material from the platform into the pockets of the scows, and the contract provided that the scows should always lie afloat, and that no stones larger than could be handled by two men should be dumped into them. There was evidence that it was customary to dump soft earth into the pockets before dumping in stones, to prevent injury to the planks. During the work libelant's scows were injured a number of times by having planks broken, and one by grounding

---

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

while being loaded, and libelant paid for their repair. Libelant brought suit against the towing company for breach of the implied condition of the charter, by failing to return them in good order, and respondent brought in the dump owner under the fifty-ninth rule. *Held*, on the evidence, that the injury to the scows was caused by the negligence of the dump owner in loading and the unsafe condition of its berth, and that it was liable therefor.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 219–221.]

In Admiralty. Suits by James Shewan & Sons against the dumper Olympia, with the Moran Towing & Transportation Company, impleaded, and by Harriet H. Healey, owner of the dumpers Olympia and Atlanta, against the Moran Towing & Transportation Company, with the Cranford Company, impleaded. Decree for libelant against the Olympia in the first suit, and for libelant against the Cranford Company in the second suit.

Foley & Martin, of New York City, for James Shewan & Sons.

Alexander & Ash, of New York City, for the Olympia.

James J. Macklin, of New York City, for Moran Towing & Transp. Co.

Grout & McKinney, of New York City, for Cranford Co.

CHATFIELD, District Judge. These actions have been tried together in the sense that the witnesses have been examined but once. The issues are distinct, and each action must be discussed from the standpoint of its own parties, and with careful discrimination between the occurrences upon which the two suits are based.

The first action is for repairs to the scow Olympia. It appears that the Olympia was chartered by a conversation over the telephone, in which the Moran Company asked the owner of the Olympia if he had a scow available for use. Upon receiving an affirmative answer and information as to the place where the Olympia was moored, one of the Moran tugs, upon the 3d day of September, 1916, took the scow from her mooring, with her captain on board, and proceeded to a dumping board of the Cranford Company at Ninth street in Brooklyn, where the scow was used to receive dirt from the subway excavation in Flatbush avenue, Brooklyn.

The scow Olympia has six pockets, each with sloping sides terminating in two gates opened and closed by means of two chains running to a windlass upon the deck of the scow. These chains are located at opposite ends of the pocket, and terminate in bridles, of which an arm runs to each of the two gates, which open downwardly and close up to a line running fore and aft of the vessel. The dumping board consists of a ramp and a platform, with tilting planes operated by machinery, from which the material, as the planes are tilted, is slid off and thus poured into the scows, which are placed under the dump and moved forward or back, according to the requirements, in order to direct the stream of earth into the desired pocket.

In the month of September, 1916, the Olympia required repairs upon three occasions. It appears from the record that she was surveyed on the 9th day of September, and that her injuries generally consisted of damages to two planks in the sloping side of the pocket, just aft of

the air chamber or central space in the scow. Again, upon the 13th day of September, 1916, the Olympia was surveyed, and it was found that she needed repairs because of damage causing leaks at the corners of the pockets, and also at a point in the bottom where the planks adjoined the opening or gate space of one of these pockets, and it appears from the testimony that three bottom planks had to be replaced and showed injury. Of these, two were broken intentionally by the dry dock men, in order to get the boat upon the dry dock and to let the water out of the boat, without going to the great expense of pumping it out, or holding the boat until it could drain out slowly. No fault is alleged in the method of making the repair, and it is necessary to assume, therefore, that the removal of these planks and their restoration was a proper item in repairing the damage caused by leakage.

Again, upon the 22d day of September, the Olympia was surveyed and repaired, when it was found that in the next pocket aft two planks had been broken upon the sloping outer side of that pocket, about halfway up from the gate. It also appears that while the boat was in the dry dock for repair of the leaks—that is, upon her second visit to the dry dock—certain extra repairs were found to be necessary and made at the request of the owner. These extra repairs had nothing to do with the so-called damage items covered by the survey. But it appears from the testimony that, at the request of the owner of the boat, the bill for all four items of repair was sent to the Moran Company, and the libelant seems to have made the first entry in its books in the form of a charge to the Moran Company at the time the bill was sent. Subsequently the Moran Company denied liability for these repairs, and in the meantime, apparently, the libelant had corrected its books, so as to show a charge for the repairs against the steamer or its owners, and had deducted the items from its bill against the Moran Company, leaving merely the notation that, at the request of the libelant, the bill had been sent to the Moran Company for payment.

[1] It is evident from the testimony that the libelant knew of the business relations between the owner of the Olympia and the Moran Company. But there is nothing to show that the Moran Company was a party to the arrangement in such a way that its credit, either as principal or as surety, took the place of the credit which evidently was given to the boat, and not to the boat's owner. The method of bookkeeping is not conclusive, when the presumption from the other facts is stronger than the presumption from an entry in the books, which would have saved labor if the Moran Company had paid the bill at the suggestion of the owner of the boat. The libelant, therefore, should have a decree against the boat, both for the specific items which were concerned with the use of the boat made by the charterer and for the bill for extras, with costs. The petition of the owner to bring in the Moran Company should be dismissed, but without costs, as the Moran Company would be responsible as charterer for all except the extras, if the failure of the Moran Company to bring in the alleged tort-feasor had not caused the bringing of a separate action by the owner of the boat.

[2] In the second action we have claims for damages to two boats, the Olympia and the Atlanta. The issue was suggested in the previous action as a defense to any claim against the Moran Company, but was not passed upon therein.

The Moran Company chartered, upon the 29th of July, 1916, the boat Atlanta, under substantially the same circumstances and form of oral charter as those previously considered in the case of the Olympia. Both of these boats were used by the Moran Company for the receipt of the subway dirt at the Ninth street dump, and as a matter of law the Moran Company, through implied contract, was bound to return the boats in good order, except for reasonable wear and tear. Any actual negligence or tort of a third party, which would create a cause of action in favor of the owner of the boat, can be brought in under the fifty-ninth rule by the charterer, if the libelant sues the charterer under such circumstances that a breach of the implied conditions of the charter is shown.

In the present case the libelant charged the Moran Company in contract with this breach of the implied conditions of the charter. The Moran Company by petition brought in the Cranford Company, and thus changed the cause of action from contract to tort. It is evident that, unless the Moran Company can satisfactorily substantiate the charge of tort against the Cranford Company, the Moran Company would be liable for the damages, if these be not shown to be caused by the acts of the captain of the scow, as indicated above with reference to the previous cause of action.

In the present case there was some attempt to show that the captain of the scow was not on board at the time some of the alleged damage occurred. There was also some evidence that it was customary to place a layer of mud over the side of the scow pocket, before stones were dumped upon the exposed plank. It is evident that the captain of the scow could neither catch any stone which might cause damage, in the act of being dumped, and prevent its striking until a layer of mud could be placed beneath it, nor would he have anything to say about the size of rocks which might be concealed in the loads of earth which were dumped upon the tilting board.

This is not a case where damage resulted from a continued use of the scow in a dangerous manner, nor from the loading of improper material after the matter had been brought to the attention of those responsible for the safety of the scow. The accidents happened, so far as the injuries were inflicted, by stones falling from the dump, through a single blow from some one stone larger than could be received with safety, or from a stone which, by its velocity, shape, or manner of striking, happened to inflict the damage. So far as the charter is concerned, therefore, the owner cannot be held responsible for the injuries, and the charterer can pass on the cause of action by bringing in, under the fifty-ninth rule, the alleged tort-feasor. We must therefore consider first whether the Cranford Company was negligent; that is, was responsible for the injuries to the boats.

It appears that the Atlanta was injured by the fall of one of these stones, and that this stone became wedged in the side of the pocket

through the breaking of two planks. The stone was large enough, so that it remained imbedded in the planking and could not be removed by the captain. The boat proceeded to sea, where the cargo of mud was dumped, and came back to the upper harbor, when she was taken to the dry dock and the stone removed by four or five men, who put it back on the boat after she was repaired. It was then taken to sea with the next load of mud and dumped into the Atlantic Ocean. We must take the evidence of its size from those who saw it at the dry dock, and it evidently was a stone of considerable weight.

The contract between the Moran Company and the Cranford Company was to the effect that the Moran Company would furnish seaworthy boats and that the Cranford Company should dump from the dumping board no stones larger than what is called two-man size; that is, those which could be handled by two rather than three or more men. According to the testimony, the stones which could pass through the bottom of the dump wagon and through the hopper of the hoisting apparatus, would not be greater than two-man size. If this particular stone exceeded, to some extent, the average size, it is possible that it had been placed in the material through the fault of some of the Cranford Company's servants, and in that case they would be liable. But if the stone was not larger than the prescribed size, then the Cranford Company was still responsible for the manner of delivering the material into the scows. The provision with respect to the size of stone was an additional obligation for the security of the Moran Company, but did not absolve the Cranford Company from careless conduct with respect to material which was proper in size. If any obligation to dump soft earth, as a bed for stony material, rested upon any one in connection with the use of the scow, the Cranford Company would be bound to see that the material was in position before stones, even of small size, were deposited where they might do damage. In the case of the Olympia, the occurrences which have been described in the previous action are also alleged as faults against the Cranford Company, and in two instances, viz., the occurrences upon September 9th and 22d, the dumping of stones which would seem not to have been larger than two-man size, but which were apparently dumped under circumstances indicating negligence of the Cranford Company, caused the damage in question. Upon the third occasion, when the bottom planks of the boat had to be replaced, the testimony shows that a small stone was wedged under the end of one of these bottom planks. It is apparent that such a stone could not have reached this position from being dumped into a pocket, and in the absence of other explanation it is necessary to conclude that this stone was forced into the seam from the outside; that is, when the boat was aground.

It is also apparent that the leakage in the corners of the pockets and the opening of the seams, which had to be repaired, was caused by excessive strain. It appears from the testimony that upon the 14th day of September, the Olympia went aground when under the Ninth street dump, that notice of this was given to the Moran office, and a tug was sent to pull the boat off the ground. The testimony of the men making the survey and the repairs is to the effect that the boat's inju-

ries had been caused by strain when she was resting upon the bottom. The contract of the Cranford Company called for the loading of boats in deep water, and no other situation from which the injury might have resulted has been suggested.

It would appear, therefore, that the Cranford Company was liable for the unsafe condition of its berth. This they seek to avoid by showing that the Olympia and the Atlanta were old, that their bridle chains broke, and that part of the load was lost in the slip upon several occasions, and that one of these dumpings of material occurred while the Olympia was under the dump, upon the day before she stranded. The Moran Company terminated the charter after the third claim of damage from the dumping of stones into the boats, and it is apparent from the correspondence and testimony of the witnesses that much dispute arose over the alleged responsibility of the Cranford Company for what happened to the boats which the Moran Company had furnished.

It is evident that the Moran Company had the option to supply other and stronger boats, and thus to avoid dispute, even if the Olympia and the Atlanta were seaworthy and strong enough to comply with the terms of the contract between the Moran Company and the Cranford Company. It should be noted that these boats were furnished to the Cranford Company under an extension of contract, made partly by letter and partly by oral agreement, and that the terms of the contract were contained in a previous written agreement, which was changed only as to the price. It is contended by the Cranford Company that the new oral agreement embodied no restrictions, but the evidence indicates that the understanding of both parties was that the terms of the previous written contract were included in the new arrangement.

It would seem that, if the Olympia went aground while being loaded, the duty would rest upon the Cranford Company to keep watch of the conditions in their slip, and, even if the obstruction in the slip came from the very boat which went aground, it would not relieve the Cranford Company from its duty to remove the boat, instead of subjecting it to the strain produced as the tide fell, or as the boat was further loaded. In fact, the testimony shows that the Cranford Company, prior to dredging out the berth, did remove the loaded boats at low tide and put in empty boats for loading until the tide raised to a point where a sufficient depth of water could be had. If the grounding of the Olympia was sufficient to cause damage, the Cranford Company cannot allege as a fault that the Moran Company towed the boat into deep water, instead of waiting for the Cranford Company to procure a tug for this purpose. Nor is there any evidence in the case that the method of towing was negligent, or that the tugboat caused the damage, in dragging the scow from the bottom.

It would seem that the small stone which was found in the bottom seam might have gotten in during this grounding; but there is nothing from which a finding could be made that the proximate cause of the leak resulting from the opening of the seam into which this stone was forced could be negligent hauling off of the boat by the Moran tug. On the contrary, the pressure of the boat when aground, and the consequent opening of seams, show the presence of an obstruction for

which the Cranford Company was responsible. The boats were evidently seaworthy, and even under the terms of the written contract between the Moran Company and the Cranford Company, if the Cranford Company found that their methods were likely to cause damage, they should have refused to use the scow and held the Moran Company for breach of contract, rather than to have so loaded the scows which were furnished as to cause damage through employment of methods in their control, from which the damage would be expected to result.

The libelant, therefore, should recover damages for the injuries to both boats against the Cranford Company, and should have his costs as well. The Moran Company brought in the Cranford Company, and was then forced to defend itself against the charge that it had furnished unseaworthy boats; but, inasmuch as the libelant recovers costs against the Cranford Company directly, no other costs will be allowed in the second action.